IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-40401

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

11,950 ACRES OF LAND, ETC., ET AL.,

Defendants,

FIRST HEIGHTS BANK,

Defendant-Cross Defendant
Cross Claimant-Appellee,

versus

PACIFIC UNION COMPANY,

Defendant-Cross Claimant
Cross Defendant-Appellant.

_____

Appeal from the United States District Court for the
Southern District of Texas
(B-93-CV-256)

_____

March 18, 1997

Before JOLLY, JONES, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

This appeal arises from a condemnation action by the United

States. It involves a disputed claim to the condemned land, which

is 11,950 acres located where the Rio Grande meets the Gulf of

_____

[*]Pursuant to Local Rule 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in Local Rule 47.5.4.

Mexico. The background of this case presents a morass of historical or procedural facts involving more than one failed savings and loan institution, the FDIC, the EPA, politics, injunctions, and various lawsuits. To be sure, the case is no stranger to this court. See In re FDIC, 58 F.3d 1055 (5th Cir. 1995); Sierra Club, Lone Star Chap. v. FDIC, 992 F.2d 545 (5th Cir. 1993). Most of this complexity, however, does not matter any more. In the final analysis, this case turns on contract interpretation. Pacific Union Company, the appellant, contracted with First Heights Bank to purchase this land, but the FDIC had to approve the sale. The FDIC approved the sale but subsequently withdrew its approval. First Heights Bank then refused to complete the sale. We hold that FDIC approval was a condition of this sale, that when the FDIC withdrew its approval the condition failed, and that First Heights Bank was relieved from performance under the contract. The judgment of the magistrate judge in favor of First Heights Bank will therefore be affirmed.

I

A

In the late 1980's, Champion Savings Association acquired title to an 11,950-acre tract of land, known as Playa del Rio, located at the southernmost tip of Texas. After acquiring title, Champion Savings Association became insolvent and was dissolved. The Federal Savings and Loan Insurance Corporation ("FSLIC") was appointed receiver. In 1988, as part of a purchase and acquisition

agreement, FSLIC transferred Playa del Rio to Heights of Texas, FSB, a predecessor to First Heights Bank, FSB (collectively "First Heights").

In 1992, First Heights and Pacific Union Company ("Pacific Union") entered into an "Unimproved Property Earnest Money Contract." This sale contract included a provision for the sale of Playa del Rio to Pacific Union for $5,884,500.[2] Under Article IX of the sale contract, execution of the sale was "conditioned upon and subject to various approval processes." First, Article IX required First Heights to submit the sale contract to its "internal approval process." Following the internal approval process, the sale contract was to be "submitted for approval by the regulatory authorities having jurisdiction over Seller which approval is required prior to sale of the Subject Property."

The regulatory authority referred to in Article IX is the Federal Deposit Insurance Corporation ("FDIC"). Its authority results from an Assistance Agreement between First Heights and FSLIC that was entered into simultaneously with the purchase and acquisition agreement by which FSLIC transferred Champion Savings Association's interest in Playa del Rio to First Heights.[3] The

_____

[2]The sale contract also includes other provisions, concerning personal property, that are not relevant to the current appeal.

[3]In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which abolished the Federal Home Loan Bank Board and the FSLIC. FIRREA also established the FSLIC Resolution Fund and appointed the FDIC as manager of the fund. Under FIRREA, the FDIC is now responsible for

Assistance Agreement obligated the FDIC to indemnify First Heights for capital losses it incurred on the sale of certain "covered assets," provided First Heights first obtained FDIC approval of the sale of those assets.[4] Playa del Rio was a covered asset under the Assistance Agreement and, thus, was subject to its provisions requiring FDIC approval.[5]

On August 4, 1992, the internal approval process was completed. Two days later, First Heights, pursuant to Article IX of the sale contract, notified Pacific Union of the approval and reminded Pacific Union that FDIC approval was still required. On September 1, First Heights submitted the required approval form to the FDIC, seeking approval of the sale contract. On September 4, the FDIC granted its approval, and First Heights communicated this approval to Pacific Union in writing on September 10. With the approval processes required by the sale contract apparently completed, the parties prepared, over the next several months, to close the transaction.

---

approving First Heights' asset sales requests. See 12 U.S.C. § 1821a(a); see also Sierra Club, Lone Star Chapter v. FDIC, 992 F.2d 545, 547 n.2 (5th Cir. 1993). Hereafter, all of these agencies will be referred to as the FDIC.

[4]The Assistance Agreement was designed to prevent First Heights from suffering a loss on the sale of assets that Champion Savings Association had carried on its books at an inflated value.

[5]The book value of Playa del Rio is reportedly $7.4 million. Thus, the proposed sale to Pacific Union for approximately $5.9 million would result in a capital loss of $1.5 million for First Heights. This loss would be made up by the FDIC under the terms of the Assistance Agreement.

On January 3, 1993, the Sierra Club, the Frontera Audubon Society, and Norman L. Richard (collectively, the "Sierra Club") filed suit against the FDIC in the United States District Court for the Southern District of Texas, seeking to require the FDIC to withdraw its approval of the sale of Playa del Rio to Pacific Union. The complaint further sought to enjoin the FDIC's approval until the environmental impact of the sale was evaluated under the National Environmental Policy Act ("NEPA"). In late January, the district court judge granted the Sierra Club relief and ordered that the FDIC

> withdraw approval and withhold future approval for Height[s]' sale to development interests of the Playa property and shall take no further action facilitating the sale of the Playa del Rio property, pending consideration by the FDIC Board of Directors of the issues surrounding the FDIC's approval or rescission of the Playa del Rio sale request.

This order, notably, enjoined only the FDIC's approval. It did not enjoin the sale of Playa del Rio to Pacific Union under the sale contract.

The FDIC appealed the order of the district court to this court. At the same time, the FDIC, in a letter dated February 5, 1993, notified First Heights of the preliminary injunction order and reported that it was in the process of appealing the order. The letter also informed First Heights of the FDIC's obligation to comply with the order by withdrawing its approval of the sale contract. The letter stated, in relevant part:

Notwithstanding the FDIC's appeal of the order, until such time as it has been vacated or modified the FDIC must comply with it. Accordingly, in compliance with such order the FDIC formally withdraws its approval of Asset Sale request #14-92-0059-01-MCA, pending further order by the District Court or the Court of Appeals.

In view of the FDIC's withdrawal of the previous approval, Heights is advised that if it should consummate the sale of the Playa del Rio to Pacific Union the FDIC will be unable to approve or to provide the capital loss coverage the Manager agreed to accept by approval of the Asset Sale Request unless and until the court order is vacated or modified.

C

On June 8, 1993, this court <u>vacated</u> the injunction and remanded the action for further proceedings.[6] <u>Sierra Club, Lone Star Chapter v. FDIC</u>, 992 F.2d 545, 552 (5th Cir. 1993). Nine days later, First Heights requested, under the terms of the sale contract, that within five days Pacific Union either waive its remaining title objections, and thereby place its $250,000 earnest money at risk, or else terminate the sale contract. Pacific Union declined to terminate the sale contract and on June 22 was deemed to have waived all remaining title objections.

In late July 1993, First Heights resubmitted an asset sale request for Playa del Rio to the FDIC for approval. On August 24,

_____

[6]The court held that the district court had jurisdiction to enjoin the FDIC from approving the sale of Playa del Rio to Pacific Union, that the Sierra Club had not yet demonstrated that it was entitled to injunctive relief, and that the district court had not complied with Federal Rule of Civil Procedure 52. <u>Sierra Club, Lone Star Chapter v. FDIC</u>, 992 F.2d 545, 552 (5th Cir. 1993). This suit was dismissed by the lower court on December 12, 1994, because it was rendered moot by the condemnation action underlying this appeal.

1993, the FDIC denied this second approval request. The following day, First Heights notified Pacific Union that the sale contract was being terminated because it had been "disapproved by the regulatory authorities having jurisdiction over Seller." That same day, First Heights and the FDIC jointly filed a declaratory judgment action against Pacific Union in the United States District Court for the Southern District of Texas, seeking a declaration that the sale contract had no force and effect. On September 1, 1993, the scheduled closing date, Pacific Union appeared for closing and tendered the full purchase price for Playa del Rio, which was rejected.

D

The United States instituted this condemnation proceeding against Playa del Rio on December 8, 1993. Both First Heights and Pacific Union appeared, claiming title to Playa del Rio and therefore the right to the condemnation award.[7] First Heights asserted a cross-claim against Pacific Union, seeking a declaration that the parties' sale contract had terminated and that Pacific Union had no rights under the contract.[8] Pacific Union answered, denying that First Heights was entitled to the relief sought. Pacific Union subsequently filed a cross-claim against First

---

[7]First Heights appeared in the action as title owner, and Pacific Union appeared, claiming rights under the sale contract.

[8]This is the same declaration sought in the declaratory judgment action jointly filed by First Heights and the FDIC.

Heights and moved to compel joinder of the FDIC. First Heights then moved for summary judgment.

On November 28, 1995, a magistrate judge[9] granted First Heights' motion for summary judgment and held that Pacific Union's motion to join the FDIC was moot. In sum, the magistrate judge concluded that the injunction voided the initial FDIC approval and that the subsequent ruling of this court did not revive the necessary approval. Two months later, the magistrate judge entered final judgment under Federal Rule of Civil Procedure 54(b) for First Heights on its claim of title to Playa del Rio.[10] Pacific Union timely appealed.

II

A

We review the magistrate judge's grant of summary judgment de novo, using the same standard employed by the court below. See Garcia v. Elf Atochem N. Am., 28 F.3d 446, 449 (5th Cir. 1994). Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with

---

[9]The parties consented to a trial before a magistrate judge and to appeal the judgment of the magistrate judge to this court. See 28 U.S.C. § 636(c).

[10]The magistrate judge initially dismissed with prejudice Pacific Union's cross-claims against First Heights and dismissed with prejudice Pacific Union as a party to the proceeding. Pacific Union timely requested amendment of the judgment, and the magistrate judge subsequently altered the judgment to dismiss Pacific Union's "damage claims" without prejudice. Pacific Union does not appeal with respect to those claims.

the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a mater of law." Fed. R. Civ. P. 56(c). We review the facts in the light most favorable to the nonmoving party and affirm the grant of summary judgment only "[i]f the record taken as a whole could not lead a rational jury to find for the nonmoving party." Garcia, 28 F.3d at 449. Our review is not limited to the reasons given by the lower court; instead, we may affirm the grant of summary judgment on any appropriate ground supported by the record. See, e.g., Davis v. Liberty Mut. Ins. Co., 525 F.2d 1204, 1207 (5th Cir. 1976). Bearing this familiar standard in mind, we turn now to the issues presented by this appeal.

B

Notwithstanding the legal, administrative and political machinations that color this case, the resolution of the simple question on appeal--who has the right to ownership of Playa del Rio--requires only an interpretation of the language found in Article IX of the sale contract. The dispute concerns the meaning of the provision that the sale contract be "submitted for approval to the [FDIC] which approval is required prior to sale of the Subject Property." First Heights contends that the contract term required FDIC approval at the time of closing--a fact that did not occur. Pacific Union, however, contends that once the initial FDIC approval was obtained, the approval conditions were satisfied and the sale contract was binding; consequently, the later revocation

and denial of approval is irrelevant because the condition of FDIC approval had been satisfied.  Thus, the question before the court is whether Article IX required approval as a one-time event, after which the contract condition was conclusively satisfied and no longer relevant, or whether FDIC approval was required upon closing.

Pacific Union advances two primary arguments on appeal: First, the plain language of the contract suggests that the requisite approval was a process that once completed had no further bearing on the execution of the contract; and second, in the alternative, the contract provision was ambiguous and, thus, a fact question existed concerning the parties' intent.  These two arguments can be addressed by a single analysis.

C

We look to Texas law for guidance in interpreting this contract.[11]  A contract is ambiguous if its meaning is unclear or

---

[11]Section 7.2 of the sale contract expressly provided that the "[c]ontract shall be construed under and in accordance with the laws of the State of Texas and all obligations of the parties are performable in Cameron County, Texas."  A federal court follows the choice of law rules of the forum in which it sits; thus, Texas choice of law rules apply to this appeal.  See Klaxon v. Stentor Elec. Mfg. Co., 61 S.Ct. 1020, 1021 (1941).  Under Texas law, "[a]n express agreement of the parties that the contract is to be governed by the laws of a particular state will be given effect if the contract bears a reasonable relation to the chosen state and no countervailing public policy of the forum demands otherwise."  DeSantis v. Wackenhut Corp., 793 S.W.2d 670, 678 (Tex. 1990) (quoting First Commerce Realty Investors v. K-F Land Co., 617 S.W.2d 806, 808-09 (Tex. Ct. App. 1981)).  Clearly, there is a "reasonable relation" between the contract and Texas, and there is no "countervailing public policy" weighing against the use of Texas

its terms are susceptible to more than a single interpretation. See Exxon Corp. v. West Tex. Gathering Co., 868 S.W.2d 299, 302 (Tex. 1993). A determination of ambiguity is a question of law that is based upon an "examin[ation of] the contract as a whole in light of the circumstances present when the contract was entered." Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd., No. 94-1206, 1996 WL 596806, at *2 (Tex. Oct. 18, 1996). An ambiguous contract is one that can be given two or more reasonable interpretations. Id. Ambiguity does not arise, however, merely because the parties to a contract suggest differing interpretations. Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 134 (Tex. 1994). Instead, ambiguity arises only if both interpretations are reasonable. National Union Fire Ins. Co. v. CBI Indus., Inc., 907 S.W.2d 517, 520 (Tex. 1995). When interpreting contract language, the "court's primary concern is to give effect to the written expression of the parties' intent." Forbau, 876 S.W.2d at 133.

Thus, in order to determine the appropriateness of the magistrate judge's grant of summary judgment, we must decide whether the approval condition has more than one reasonable interpretation, a finding that would preclude summary judgment. We turn now to the sale contract.

law to interpret the contract.

D

Article IX of the sale contract is entitled "Required Approvals."[12]  The first sentence of the Article reads as follows:

---

[12]Article IX appears in the contract as follows:

**IX.  REQUIRED APPROVALS**

This Contract is conditioned upon and subject to various approval processes.  Seller operates pursuant to an internal approval process which requires approval by certain authorized committees and its Senior Asset Management Committee.  Thereafter, this Contract shall be submitted for approval by the regulatory authorities having jurisdiction over Seller which approval is required prior to sale of the Subject Property.  Seller's execution of this Contract is contingent upon such approvals.  Execution of this Contract by Seller is not binding upon Seller pending completion of the approval process.  Seller shall promptly notify Buyer, in writing, after approval of this Contract by Seller's Senior Asset Management Committee and the appropriate regulatory authorities.  Buyer may not, and agrees it will not rely upon any oral discussions, representations, agreements or the like, unless contained in a letter addressed to Buyer executed by Seller stating: (I) the status of the approval process, or (ii) that certain approvals have been received.  Buyer waives all rights against Seller, its officers, employees, representatives, attorneys, agents, independent contractors and affiliates relating to any representations relating to this matter and agrees not to sue or otherwise hold such parties liable for any reliance by Buyer on such representations.

Seller will recommend regulatory approval of this Contract and will submit all reasonably necessary documentation in support thereof through appropriate channels.  Seller cannot and does not make any representations regarding the ultimate approval or disapproval of this Contract.  In the event of disapproval of this Contract, Seller shall notify Buyer and this Contract shall terminate, Buyer shall be returned the Earnest Money and all parties shall be released from any liability hereunder.  If regulatory approval or disapproval is not obtained within one hundred twenty (120) days after the Effective Dated, then either party may terminate this Contract by written notice served upon the other party between the expiration of such one hundred twenty (120) day period and the date

-13-

"This Contract is <u>conditioned upon</u> and subject to various approval processes."  The Article further states that the "Seller's execution of this Contract is <u>contingent upon</u> such approvals." Article IX also makes clear that, "<u>[i]n the event of disapproval</u> of this Contract, Seller shall notify Buyer and this Contract <u>shall terminate</u>."  Among the approvals required was that of the FDIC.

We think that Article IX, and specifically the language we have quoted and underscored above, could hardly make clearer the significance and importance to First Heights of FDIC approval of the sale of Playa del Rio.  The reason underlying the importance of approval to First Heights is, in its essence, undisputed: The FDIC had agreed that, <u>so long as it approved the sale</u> of Playa del Rio, it would reimburse First Heights for the difference between the book value of the property and the sale price.  It is undisputed that Pacific Union knew of the Assistance Agreement and that FDIC approval was a "deal point" with First Heights, that is, without FDIC approval, there was no deal.  Based on the record before us, the FDIC had no obligation to any of the parties to continue its approval once given.  The FDIC has been consistent in its position

_____

> upon which regulatory approval is obtained, in which event the Earnest Money shall be refunded to Buyer and both parties shall be released from any liability hereunder.  Seller has disclosed to Buyer and Buyer acknowledges that the approval process of the regulatory authorities is confidential, that Buyer may not be involved in the process and that direct documentation of the process and any acceptance or rejection is not possible. Buyer covenants to take no action to influence or interfere with the regulatory approval process.

-14-

that it had the right to withdraw its approval, and that, upon withdrawal of approval, it had no further obligation to indemnify First Heights for its loss. There is no provision in the contract to the contrary, and the FDIC's position is not disputed by the parties. Clearly, when the FDIC withdrew its approval and subsequently refused to approve the new request, First Heights was exposed to the very loss that the condition of approval was designed, and was understood by the parties, specifically to prevent.

On the other hand, Pacific Union's interpretation that the condition was satisfied by the first approval and that the subsequent withdrawal and refusal were of no contractual relevance, totally vitiates the purpose of the condition. Pacific Union's position would require First Heights to consummate the sale <u>without</u> FDIC approval, which would relieve the FDIC of its indemnification obligations. In turn, this interpretation would strip First Heights of the benefit of indemnification and loss protection, which it sought expressly to preserve. Furthermore, to interpret Article IX as Pacific Union urges, would require First Heights to complete the sale of Playa del Rio for $1.5 million dollars less than the contract itself anticipated, a point fully understood by the parties.

We thus conclude that Pacific Union's interpretation is unreasonable and that, because the interpretation advanced by First Heights is the only reasonable interpretation of the approval

provision, the contract is not ambiguous.  Summary judgment was therefore appropriate.[13]

E

Pacific Union asserts that, even if the provision is interpreted to require valid FDIC approval at the time of closing, First Heights has waived this condition precedent and is now estopped from relying upon the withdrawal and subsequent denial of FDIC approval to avoid the contract obligation to convey Playa del Rio to Pacific Union.

Waiver results from the express relinquishment of a right or from intentional conduct inconsistent with the exercise of that right.  See First Interstate Bank of Ariz. v. Interfund Corp., 924 F.2d 588, 594-95 (5th Cir. 1991); Sun Exploration & Prod. Co. v. Benton, 728 S.W.2d 35, 37 (Tex. 1987).  Quasi-estoppel precludes a party from asserting, to the disadvantage of another, a right inconsistent with a position previously taken.  Missouri Pac. R.R. Co. v. Harbison-Fischer Mfg. Co., 26 F.3d 531, 537 (5th Cir. 1994); Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd., 817 S.W.2d 160, 164 (Tex. Ct. App. 1991).

---

[13]Our interpretation of Article IX renders unnecessary any discussion of whether FDIC approval, withdrawn by the letter to First Heights, was revived by the order of this court vacating and remanding the Sierra Club injunction.  We conclude that the condition of approval required FDIC approval upon closing, and the formal disapproval clearly establishes that the condition was not met at closing.

-16-

Pacific Union's waiver and estoppel argument is without merit, because the parties entered into a series of letter agreements, after the withdrawal of approval, delaying the date of closing and specifically providing:

> By execution of this letter, neither party hereto waives any of its claims, causes of action, rights or remedies with regard to the Contract and each of such claims, causes of action, rights or remedies are reserved including, without limitation, those pursuant to Article IX of the Contract. In addition, neither party makes any representations or warranties, express or implied, beyond those set forth in the Contract.

Through these agreements, First Heights expressly preserved its rights under Article IX and cannot therefore be said to have waived those rights. Furthermore, there is no evidence that First Heights ever took a position other than the position that FDIC approval was necessary to the closing of the contract.

### III

For the foregoing reasons, we find that the sale contract was not ambiguous and only reasonably can be interpreted to require FDIC approval at the time of closing. To interpret the condition in any other way would nullify the purpose of the inclusion of the condition, which was to protect First Heights from bearing the burden of closing the sale without assurance of reimbursement from the FDIC. Further, we find that Pacific Union failed to raise a fact issue with respect to its defenses of waiver and quasi-estoppel. Our holding renders moot Pacific Union's appeal from the

magistrate judge's refusal to compel joinder of the FDIC as a party to this action.[14]

The judgment of the magistrate judge is

A F F I R M E D.

---

[14]Our holding also makes it unnecessary for us to consider the argument advanced by First Heights that the contract obligations should be discharged by operation of the principle of "frustration of purpose."